# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

RICKY MASON,

              Plaintiff,

v.

NANCY JOHNSTON, KEVIN MOSER,
TERRY KNEISEL, STEVE SAYOVITZ,
BLAKE CAREY, RANDY P. GORDON,
JORDAN GOODMAN, JIM BERG,
MINNESOTA DEPARTMENT OF
HUMAN SERVICES, and THANE
MURPHY,

              Defendants.

Case No. 19-CV-2597 (JRT/KMM)

**REPORT AND RECOMMENDATION**

---

      This action comes before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint, ECF No. 11 (Motion). The Motion is fully briefed and ready for review. *See, e.g.*, Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss Pl.'s Compl., ECF No. 13 (Memorandum); Pl.'s Resp. & Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pl.'s Compl., ECF No. 19 (Response); Defs.' Reply Mem. of Law in Supp. of Their Mot. to Dismiss Pl.'s Compl., ECF No. 20 (Reply).[1] For the following reasons, the Court recommends that the Motion be granted in part and denied in part.

---

[1] As noted in the Order dated January 3, 2020, ECF No. 22, the Court will consider Mr. Mason's Response.

## I.    BACKGROUND

Mr. Mason is a civilly committed client at the Minnesota Sex Offender Program (MSOP) in Moose Lake, Minnesota. *See* Compl. for Violation of Civil Rights Under 42 U.S.C. § 1983 at 1, 3, ECF No. 1. The Complaint's thrust is that MSOP staff have violated Mr. Mason's constitutional rights—in particular, his rights under the First and Fourteenth Amendments—by imposing "restrictions regarding visitation and phone communications" between Mr. Mason and Cara Lea Keinanen, a former MSOP employee. *Id.* at 1–2, 5.

### A.    Defendants

The Complaint's caption names eight Defendants, all affiliated with MSOP in some way: (1) Nancy Johnston, MSOP's chief executive officer; (2) Jim Berg, MSOP's deputy director; (3) Kevin Moser, the facility director at MSOP's Moose Lake facility; (4) Terry Kneisel, the associate facility director at the Moose Lake facility; (5) Steve Sayovitz, MSOP's security-program manager at Moose Lake; (6) Blake Carey, the MSOP unit director for "Complex Unit 1-A" at Moose Lake; (7) Randal Gordon, MSOP's Behavioral Expectations Unit supervisor;[2] and (8) Jordan Goodman, an MSOP employee who served as Mr. Mason's "designee" during the relevant time period. *See id.* at 3–4.[3]

---

[2] Mr. Mason refers to Mr. Gordon as the "BEU Supervisor," *see* Compl. 4; the Court understands BEU to refer to MSOP's Behavioral Expectations Unit.

[3] Throughout this discussion of the Complaint, the Court assumes, as it must, the truth of the Complaint's factual allegations. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Edner v. Redwood Cty. Dist. Att'y's Office*, No. 19-CV-2486 (SRN/LIB), 2020

The Complaint's list of Defendants contains one entity and one individual not included in the caption.  *See id.*  The entity is "Department of Human Services," apparently referring to the Minnesota Department of Human Services (MDHS).  *Id.* at 3. The Complaint describes MDHS as "the agency responsible for overseeing the running of the State Hospitals," presumably including MSOP.  *Id.*  The additional individual is Thane Murphy, the supervisor of MSOP's Office of Special Investigations (OSI).  *See id.* at 4.  As the Court construes filings by pro se litigants liberally, *see, e.g.*, *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), the Court will treat the Complaint as though it names MDHS and Mr. Murphy as Defendants.

### B.    Allegations

The gravamen of this action concerns MSOP personnel's application of two policies: (1) a policy on visits to MSOP clients, and (2) a policy on MSOP-client telephone use.  *See generally* Compl.  According to Mr. Mason, Ms. Johnston revised and signed the relevant versions of both policies, and is "responsible for" them.  *See id.* at 4–5, 33.  Mr. Mason also asserts that MDHS is "responsible for policies, procedures, and practices implemented through its various agencies."  *Id.*

Particularly relevant here is the application of the visitation and telephone-use policies to Ms. Keinanen.  Ms. Keinanen stopped working for MSOP sometime in 2016. *See id.* at 5.  The Complaint does not say exactly when Ms. Keinanen left MSOP's

---

WL 2215724, at *2 (D. Minn. May 7, 2020) (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).

employ, but suggests that it was before July 15, 2016. *See id.* (stating that as of July 15, 2017, Ms. Keinanen "had already been separated from the MSOP for over a year"). In July 2017, because a year had passed since Ms. Keinanen had left MSOP, she could be on an MSOP client's visiting list. *See id.*

Notwithstanding this, in July 2017, Mr. Mason received a notice indicating that Ms. Keinanen's status as an approved visitor had been denied because of "security issues." *See id.* (capitalization amended). On August 3, 2017, Mr. Mason submitted a "Client Request form" (CRF) to Mr. Moser challenging the visitor-status denial. *See id.* at 5–10. On August 8, 2017, Mr. Moser responded that Ms. Keinanen's "denied status" would remain in effect. *See id.* at 5.

On August 14, 2017, Mr. Mason received a "Notice of Client Telephone Block," signed and approved by Mr. Moser, stating that MSOP staff were blocking Ms. Keinanen's telephone number for one year, preventing her from calling Mr. Mason. *Id.* at 10. As the reason, the notice stated that the calls were "[i]nterfering with the therapeutic treatment program process." *Id.*

Mr. Mason presents several allegations about this notice; the Court will detail them here because Mr. Mason largely levels the same allegations about most of the communications, discussed below, that he received from MSOP staff. *See generally id.* at 10–33. First, Mr. Mason states that, aside from the quoted statement about interference with MSOP's therapeutic program, the notice "gave no other explanation such as how this affected the safety or security of the institution." *Id. at* 10. Second, Mr. Mason states that the person sending the document (here, Mr. Moser) "could have corrected the

4

issue but failed to take any corrective action." *Id.* Third, Mr. Mason states that "[t]here was not, nor is there any legitimate, bona fide, penological or therapeutic reasons" for preventing Mr. Mason from communicating with Ms. Keinanen. *Id.* Fourth, Mr. Mason claims that by sending the notice, Mr. Moser violated his (Mr. Mason's) rights under the First Amendment and Fourteenth Amendment. *Id.* at 10–11.

On August 16, 2017, Mr. Mason apparently received a second "Notice of Client Telephone Block" concerning Ms. Keinanen's phone number (again signed and approved by Mr. Moser). *See id.* at 11.[4] Like the first notice (and the later ones), this notice indicated MSOP staff were implementing a year-long restriction on calls from the number. *See id.* at 10–11, 13–18. Mr. Mason filed a grievance with MSOP staff that same day, *see id.* at 11–13, and later that day, Mr. Moser denied the grievance, stating that the "phone number will remain blocked for security and interfering with the therapeutic treatment process concerns." *Id.* at 12. Between August 23, 2017, and September 18, 2017, various MSOP staff sent Mr. Mason seven more "Notice[s] of Client Telephone Block." *See id.* at 13–18.[5] Mr. Mason presents similar allegations

---

[4] It is unclear to the Court whether this second notice was issued because Ms. Keinanen had two different relevant phone numbers, or for some other reason.

[5] Mr. Mason asserts that (1) Mr. Moser "created and signed off" on notices dated August 23, 2017, and September 5, 2017; (2) Mr. Goodman "created and signed off" on a notice dated August 28, 2017; (3) Mr. Sayovitz "created and signed off" on a notice dated August 29, 2017; and (4) Mr. Kneisel "created and signed off" on notices dated September 11, 2017, September 12, 2017, and September 18, 2017. Compl. 13–18.

about each of these notices, which were apparently similar to those that Mr. Mason had received earlier in August.[6]

On September 19, 2017, Mr. Mason received a "Behavioral Expectations Report" (BER) approved and signed by Mr. Carey and Mr. Gordon. *Id.* at 18–19. The BER asserted a "fail[ure] to comply," which Mr. Mason describes as a "major violation." *Id.* at 18. Because of the BER, Mr. Mason acquired restriction status "RS3," under which MSOP staff restricted him to his "client room" and he could not participate in "off unit activities" or have any "contact visitation." *Id.* at 18 n.2. The basis for the BER was that Mr. Mason "failed to follow the Client Telephone Use Policy by calling an MSOP staff member that has separated from employment"—presumably Ms. Keinanen. *Id.* at 18.

Communications recounted in the Complaint indicate that, within a few weeks of Mr. Mason receiving the BER, MSOP staff began to let Mr. Mason and Ms. Keinanen speak by phone again. *See, e.g.*, *id.* at 21, 25, 30. It is unclear whether MSOP staff ever reversed the denial of Ms. Keinanen's denied-visitor status.

Mr. Mason's next allegations concern conduct from February 2019, almost a year and a half after he received the BER. *See id.* at 19. On February 27, 2019, Mr. Mason submitted a CRF to MSOP's OSI asking why MSOP staff had blocked a phone number— again, presumably Ms. Keinanen's. *See id.* The OSI responded by simply referring Mr.

---

[6] Notably, Mr. Mason does not assert who these notices concerned—in other words, he does not specifically allege that they all dealt with potential communications with Ms. Keinanen. *See id.* For purposes of reviewing the Complaint, the Court assumes that each of these notices involved a block on phone communications with Ms. Keinanen. Defendants have made the same assumption. *See* Mem. 3 n.5.

Mason to MSOP's policy on client telephone use. *See id.* Mr. Mason followed up on this response by submitting a CRF to Mr. Moser. *See id.* Mr. Moser replied with a document stating that "[t]here are ongoing concerns about [Mr. Mason's] contact with past staff." *Id.* at 20.

On March 18, 2019, Mr. Mason wrote a letter to Ms. Johnston explaining his concerns about MSOP blocking Ms. Keinanen's phone number. *See id.* at 20–21. Ms. Johnston responded on March 29, 2019. *See id.* at 22. She stated that MSOP policy "does not require the facility director to provide a specific rationale [for blocking numbers pursuant to MSOP's Client Telephone Use policy] and it may in fact be inappropriate to do so." *Id.* Ms. Johnston also wrote that she had been in contact with the MSOP–Moose Lake grievance coordinator, and that "it appears that you [Mr. Mason] have not taken advantage of/followed protocols outlined in [MSOP's] Client Grievances policy . . . ." *Id.*

Perhaps unsurprisingly, on April 10, 2019, Mr. Mason sent Mr. Moser a "Grievance Narrative" that summarized Mr. Mason's prior problems with communicating with Ms. Keinanen. *Id.* at 23. (This largely focuses on MSOP staff blocking Ms. Keinanen's phone number, but also mentions that Ms. Keinanen was "not allowed to visit [Mr. Mason] in person." *See id.*) Mr. Moser's "Grievance Appeal Response," issued on April 15, 2019, dismissed the grievance. *Id.* at 24–25. As its "basis for determination," the Response stated (in full): "MSOP policy permits the facility director to block numbers of staff who have been separated. You were involved in an inappropriate relationship with this staff. When it was reported that you had ongoing phone

7

communication with this separated staff, an additional phone block was implemented." *Id.* at 25.

On April 19, 2019, Mr. Mason submitted "an executive Grievance Appeal" to Ms. Johnston. *Id.* at 25–26. This again discussed Mr. Mason's complaints about being prevented from communicating with Ms. Keinanen—though here the focus was only on telephone communications, with no mention of in-person visitation. *See id.* Ms. Johnston and Mr. Berg issued a Grievance Appeal Response dated April 30, 2019, that dismissed the grievance. *See id.* at 27–28.

In May 2019, Mr. Mason communicated with Stana Davis, an MSOP employee in MSOP's legal department. *See id.* at 28. Mr. Mason asked whether he was "the subject of any confidential data," and Ms. Davis reported that he was not. *Id.* at 28–29.

On June 10, 2019, Mr. Mason again wrote to Ms. Johnston; this letter again complained about the blocks on his communications with Ms. Keinanen, and also detailed Mr. Mason's attempts to use MSOP's grievance procedure. *See id.* at 29–30. In particular, he objected to Mr. Moser's assertion (in the April 15 Grievance Appeal Response) that Mr. Mason had been involved in an inappropriate relationship with Ms. Keinanen. *See id.* at 29. Pointing to Ms. Davis's statement that he was not the subject of any confidential data—the idea being that, whatever the source of MSOP staff's concerns about communications with Ms. Keinanen, it was nothing confidential—he repeatedly asked for an explanation of why Ms. Keinanen's phone number was being blocked.

Ms. Johnston wrote back on June 19, 2019, stating (in relevant part) that the decision to block Ms. Keinanen's phone number was a decision that "the Facility Director" had the authority to make, and that she "support[ed]" that decision. *Id.* at 32.

### C.    Causes of Action

In general, Mr. Mason alleges that Defendants' conduct—in particular, their implementation of the policies blocking visits and telephone calls from Ms. Keinanen, and their communications refusing to intercede when asked to end the restrictions—violated his First Amendment right to freedom of association and his Fourteenth Amendment right to due process. *See, e.g.*, *id.* at 1. He brings his claims against Defendants pursuant to 42 U.S.C. § 1983, and sues all the individual Defendants in their individual and official capacities. *See id.* at 1–2.

As a practical matter, the Court distinguishes between Mr. Mason's claims about the visitation policy and his claims about the telephone-use policy. The Court thus construes the Complaint as raising a First Amendment claim and a Fourteenth Amendment claim concerning the visitation policy, as well as a First Amendment claim and a Fourteenth Amendment claim concerning the telephone-use policy. Furthermore, because the Complaint explicitly refers to both procedural due process and substantive due process, *see, e.g.*, *id.* at 34, the Court interprets the Complaint as pressing, as to both policies, a procedural-due-process claim and a substantive-due-process claim. The Court thus sees the Complaint as pressing six causes of action; as best as the Court can tell, Mr. Mason purports to bring all claims against all Defendants.

9

One aspect of Mr. Mason's First Amendment claims deserves further mention now. First Amendment challenges to statutes or regulations come in two general forms: *facial* challenges and *as-applied* challenges. To prevail on a facial challenge, a plaintiff generally must "establish that no set of circumstances exists under which the ordinance would be valid, or that the statute lacks any plainly legitimate sweep." *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012) (en banc) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up)).[7] In contrast, "[a]n as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court. If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758–59 (1988)).

Mr. Mason's claims related to the relevant MSOP policies are not facial challenges, but as-applied challenges. Specifically, Mr. Mason challenges the actual application of MSOP's visitation and telephone-use policies to his interactions with Ms. Keinanen. This is made particularly clear by the Complaint's requests for relief, where Mr. Mason asks for "[i]njunctive relief enjoining Defendants from future and further denial of any kind of communication or contact (visitation) between [Mr. Mason] and

---

[7] In a special class of facial First Amendment claims, "'a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Sisney v. Kaemingk*, 886 F.3d 692, 697–98 (8th Cir. 2018) (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The Complaint plainly does not assert this sort of overbreadth claim.

Ms. Keinanen." Compl. 35. The Court thus construes Mr. Mason's First Amendment challenges here to be as-applied challenges.

### D. Requests for Relief

The Complaint asks for "[a]ll appropriate declaratory and injunctive relief" and "[a]ll appropriate preliminary and permanent injunctions"—including, as noted above, injunctive relief preventing Defendants from blocking contact between Mr. Mason and Ms. Keinanen. *Id.* He specifies that the injunctive-relief requests target the individual Defendants in their official capacities. *See id.* at 1. Mr. Mason also seeks "monetary and compensatory damages" from all Defendants, but only in Defendants' individual capacities. *See id.*; *see also id.* at 35 (asking for "[j]udgment in favor of Plaintiff against Defendants, jointly and severally, for damages in amounts to be proven at trial").

## II. ANALYSIS

### A. Screening Standards

Defendants bring the Motion pursuant to Rule 12 of the Federal Rules of Civil Procedure—more specifically, Rule 12(b)(1) and Rule 12(b)(6). *See, e.g.*, Mem. 1.

Rule 12(b)(1) governs dismissal of a complaint for lack of subject-matter jurisdiction. Jurisdiction is "a threshold question," and is properly decided at the outset of litigation, in the interest of judicial economy. *See Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990); *Munt v. Schnell*, No. 18-CV-3390 (DWF/ECW), 2020 WL 1695420, at *5 (D. Minn. Jan. 31, 2020) (making similar point (quoting *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991)), *report and recommendation adopted*, 2020 WL 968353 (D. Minn. Feb. 28, 2020). The plaintiff "bears 'the burden of proving

the existence of subject matter jurisdiction.'" *See, e.g.*, *Buckler v. United States*, 919

F.3d 1038, 1044 (8th Cir. 2019) (quoting *Green Acres Enters., Inc. v. United States*, 418

F.3d 852, 856 (8th Cir. 2005)); *Rader v. Ally Fin., Inc.*, No. 19-CV-1275 (NEB/TNL),

2020 WL 958751, at *4 (D. Minn. Jan. 31, 2020) (making same point (citing cases)),

*report and recommendation adopted*, 2020 WL 954736 (D. Minn. Feb. 27, 2020).  When

addressing a Rule 12(b)(1) motion, a court accepts the pleadings' factual allegations as

true and must view them in the light most favorable to the nonmoving party.  *See, e.g.*,

*Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir.

2010); *see also A.K.B. v. Indep. Sch. Dist. 194*, No. 19-CV-2421 (SRN/KMM), 2020 WL

1470971, at *4 (D. Minn. Mar. 26, 2020) (citing *Great Rivers*).

Rule 12(b)(6), in contrast, governs motions to dismiss for failure to state a claim

upon which relief can be granted.  "To withstand a Rule 12(b)(6) motion, a complaint

must contain sufficient factual allegations to 'state a claim to relief that is plausible on its

face.'"  *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 547 (2007)); *see also, e.g*, *Gorbaty v. Mitchell Hamline

Sch. of Law*, No. 20-CV-0745 (PAM/KMM), 2020 WL 2769148, at *3 (D. Minn. May

28, 2020) (quoting same portion of *Twombly*).  While "detailed factual allegations" are

not required, the facts in a complaint must be specific enough to "raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555; *see also, e.g.*, *Reichel Foods,

Inc. v. Proseal Am., Inc.*, No. 19-CV-2604 (ECT/KMM), 2020 WL 2572707, at *4 (D.

Minn. May 21, 2020) (making same points (quoting *Twombly*)).  It is not enough for a

complaint to employ "labels and conclusions," or simply restate the elements—more is

required. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also, e.g.*, *Johnson v. Precythe*, 954 F.3d 1098, 1101 (8th Cir. 2020) (quoting *Iqbal*). "In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (citing cases); *see also, e.g.*, *Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, No. 19-CV-1513 (ECT/TNL), 2020 WL 881711, at *4 (D. Minn. Feb. 24, 2020) (quoting *Raynor*).

### B.    Official-Capacity Damages Claims and Claims Against MDHS

Defendants' first argument is that the Court should dismiss any damages claims that Mr. Mason raises against Defendants in their official capacities with the State of Minnesota. *See* Mem. 10–11. Mr. Mason responds that he is "not requesting money damages against [Defendants] in their official capacities," and that he sought monetary damages against Defendants "in their individual capacities only." Resp. 5.[8]

The Court agrees with Mr. Mason that the Complaint seeks monetary damages against Defendants only in their individual capacities. *See, e.g.*, Compl. 1 ("Plaintiff seeks monetary and compensatory damages against Defendants in their individual capacities only." (capitalization amended)). Given this, the Court doubts that there are really any official-capacity damages claims here to dismiss. As a formality, however, the

---

[8] Any claims against MDHS, of course, must be in its official capacity—it is not an individual, and so has no individual capacity.

Court recommends granting Defendants' motion to dismiss as to any official-capacity claims for damages that could be read to lurk within Mr. Mason's Complaint.[9]

Within their discussion of the official-capacity damages claims, Defendants observe that Mr. Mason includes MDHS as a defendant. *See* Mem. 11 n.7. Because MDHS is not a "person within the meaning of § 1983," they argue, any § 1983 claims against MDHS are "barred by the Eleventh Amendment" and should "be dismissed for lack of subject matter jurisdiction." *Id.* Mr. Mason does not dispute these points.

The Court agrees with Defendants' jurisdictional point. MDHS is an agency of the State of Minnesota, and the Eleventh Amendment bars any suit against a state or a state entity, no matter the relief sought. *See, e.g.*, *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *see also Henderson v. Minnesota*, No. 19-CV-0135 (MJD/ECW), 2019 WL 8109670, at *11 (D. Minn. Dec. 30, 2019) (making same points (quoting cases)), *report and recommendation adopted*, 2020 WL 980129 (D. Minn. Feb. 28, 2020). The Eleventh Amendment thus bars the Complaint's claims against MDHS. The Court therefore recommends that these claims be dismissed without

---

[9] To be clear, if Mr. Mason had tried to press any damages claims against Defendants in their official capacities, the Court would almost certainly recommend those claims' dismissal without prejudice for lack of jurisdiction. The Eleventh Amendment generally bars official-capacity claims for damages against state-government employees. *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 278 (1986) (citing *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459 (1945), *overruled on other grounds, Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 623 (2002)); *Hummel v. Minnesota Dep't of Agric.*, 430 F. Supp. 3d 581, --- (D. Minn. 2020) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)).

prejudice for lack of subject-matter jurisdiction, and that MDHS be dismissed from this action.

### C.   Lack of Allegations Concerning Mr. Carey, Mr. Gordon, and Mr. Murphy

Defendants' second argument is that the Complaint lacks sufficient allegations "of personal involvement in any unconstitutional act by" Mr. Carey, Mr. Gordon, and Mr. Murphy.  *See* Mem. 11–12.  Mr. Mason contests this argument as to Mr. Carey and Mr. Gordon, but provides no response concerning Mr. Murphy.  *See* Resp. 6–8.

The Court will consider Mr. Murphy first.  The Court agrees with Defendants that the Complaint's only substantive allegation about Mr. Murphy is that he worked for MSOP as the "Office of Special Investigations Supervisor."  *See* Compl. 4.  The Complaint does discuss a CRF that Mr. Mason sent to OSI in February 2019, as well as OSI's response.  *See id.* at 19.  As best as the Court can tell, the Complaint does not ascribe any conduct to Mr. Murphy himself: Mr. Murphy was apparently OSI's supervisor at the time, but the Complaint does not allege that he prepared OSI's response and says nothing whatsoever about his involvement with it.  *See id.*

That silence is dispositive.  To state a § 1983 claim against an individual, a plaintiff must allege that individual's own personal involvement with the relevant constitutional violations; it is not enough to plead—much less merely imply—that a defendant supervised others who themselves violated the plaintiff's rights.  *See, e.g.*, *Iqbal*, 556 U.S. at 676 (2009); *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020) (citing *Iqbal*).  For Mr. Murphy, the Complaint's allegations are insufficient.  The Court

recommends that the Complaint's claims against Mr. Murphy be dismissed without prejudice, and that Mr. Murphy be dismissed from this action.

The Court next considers the Complaint's allegations against Mr. Carey and Mr. Gordon. As discussed above, the Complaint alleges that Mr. Carey serves as the "Complex Unit 1-A Unit Director" at MSOP, and that he "approved and signed" the BER that Mr. Mason received in September 2017. Compl. 4, 18–19. At the tail end of the Complaint's factual allegations, Mr. Mason also alleges that Mr. Carey "punished [Mr. Mason] by assigning him restrictions after [Mr. Carey] gave [Mr. Mason] a BER" (presumably the September 2017 BER). *Id.* at 33. As for Mr. Gordon, the Complaint alleges that he serves as MSOP's "BEU Supervisor," and that he also "approved and signed" the September 2017 BER. *Id.* at 4, 18–19. As with Mr. Carey, Mr. Mason also asserts that Mr. Gordon "punished [Mr. Mason] by assigning him restrictions" after Mr. Carey gave him a BER. *Id.* at 33.

In the Court's view, the Complaint suggests two different ways in which Mr. Carey and Mr. Gordon were personally involved with infringing Mr. Mason's constitutional rights. First, they allegedly approved and signed the September 2017 BER. Second, apart from approving and signing that document, they allegedly punished Mr. Mason by assigning him certain unspecified restrictions.

For the first set of conduct, the Court finds that Mr. Mason has adequately pleaded Mr. Carey's and Mr. Gordon's personal involvement. The theory of how the 2017 BER infringed on Mr. Mason's constitutional rights is straightforward: he alleges that he was issued the BER due to phone contact with Ms. Keinanen, and the Complaint's gravamen

is that blocking such contact violates Mr. Mason's constitutional rights.  *See id.* at 18.  To be sure, it is not entirely clear what it means to "approve[] and sign[]" a BER, but at present the Court views pleading such involvement as sufficient.  The Court thus denies the Motion to the extent it seeks dismissal of claims against Mr. Carey and Mr. Gordon based on their signing and approving of the September 2017 BER.

On the other hand, the Court recommends the dismissal of the Complaint's claims that Mr. Carey and Mr. Gordon infringed Mr. Mason's constitutional rights by punishing him with post-BER "restrictions."  The problem here is not lack of an appropriate constitutional-violation theory: under the Fourteenth Amendment's Due Process Clause, MSOP clients—like pretrial detainees—have a right not to be punished without adequate procedural protections.  *See, e.g.*, *Block v. Rutherford*, 468 U.S. 576, 583 (1984) ("'[U]nder the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *Meyer v. Stacken*, No. 17-CV-1761 (ADM/KMM), 2019 WL 4675353, at *3 (D. Minn. July 25, 2019) ("The Eighth Circuit has determined that MSOP's civil detainees are most similar to pretrial detainees for the purpose of assessing constitutional protections." (citing *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009)), *report and recommendation adopted*, 2019 WL 4673941 (D. Minn. Sept. 25, 2019).

The problem, rather, is that the Complaint puts no meat on the bare bones of this punishment allegation.  There is no explanation of *how* Mr. Carey and Mr. Gordon punished Mr. Mason—e.g., what problematic "restrictions" they placed on him, when these were in place, how they affected Mr. Mason, etc.  The Complaint's punishment

allegation is just a conclusory assertion. And it is precisely this sort of "mere conclusory statement[]" that this Court need not credit when addressing a motion to dismiss. *Iqbal*, 556 U.S. at 678; *see also, e.g.*, *Anderson v. St. Luke's Hosp.*, No. 19-CV-0106 (MJD/LIB), 2019 WL 7882118, at *5 (D. Minn. Nov. 19, 2019) (making same point (citing cases)), *report and recommendation adopted*, 2020 WL 256176 (D. Minn. Jan. 17, 2020). As a result, the Court recommends dismissing without prejudice the Complaint's claims against Mr. Carey and Mr. Gordon based on their alleged punishment of Mr. Mason after Mr. Mason received the September 2017 BER.

### D. First Amendment Claims

Defendants present numerous arguments in support of their motion for dismissal of Mr. Mason's First Amendment claims. First, they assert that no right to visitation exists for a person committed at MSOP. They also allege that, because Mr. Mason was a class member in *Karsjens v. Piper*, No. 11-CV-3659 (DWF/TNL) (D. Minn.), he is precluded from challenging MSOP's visitation policy in subsequent litigation. And finally, Defendants argue that application of the "*Turner* test"—from *Turner v. Safley*, 482 U.S. 78 (1997)—to this case demonstrates that Mr. Mason fails to state a viable First Amendment claim as to the application of either its phone or its visitation policy in this case. The Court addresses these arguments in turn.

### 1.    Existence of a First Amendment Right

Defendants assert that Mr. Mason has no First Amendment right to visitation.  *See* Mem. 13–17.[10]  Defendants' key point here is that "as a civilly committed sex offender in a secure treatment facility, [Mr. Mason] does not possess a constitutionally-protected right to visitation that is supported by the First Amendment."  *Id.* at 13.  Mr. Mason disagrees.

To Defendants' credit, they acknowledge that several decisions in this District have addressed whether pretrial detainees—including MSOP clients—have a First Amendment right to visitation.  *See id.* at 15 n.10.  This Court wrote one of those opinions, one of three refusing to dismiss an MSOP client's visitation-related First Amendment claim in the face of a motion to dismiss.  *See Meyer*, 2019 WL 4675353, at *3.[11]

Addressing almost exactly the same point at issue here, this Court stated the following:

> MSOP argues that [the plaintiff] fails to state a claim upon which relief can be granted because his right to freedom of association was not violated by MSOP's decision to forbid visitation by his minor niece.  The Court disagrees.  In the context of prisoners, inmates retain "those First Amendment

---

[10] As the Court understands the relevant portion of the Memorandum, Defendants are not arguing that Mr. Mason has no First Amendment rights concerning phone calls.  *See generally* Mem. 13–17.

[11] *See also Williams v. Johnston*, No. 14-CV-0369 (DWF/FLN), 2015 WL 1333991, at *6–8 (D. Minn. Jan. 28, 2015), *report and recommendation adopted*, 2015 WL 1334015 (D. Minn. Mar. 25, 2015); *Knutson v. Ludeman*, No. 10-CV-0357 (PJS/LIB), 2011 WL 821253, at *7–9 (D. Minn. Jan. 12, 2011), *report and recommendation adopted in relevant part*, 2011 WL 808189 (D. Minn. Mar. 1, 2011).

rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Although [the plaintiff] is a civil detainee rather than a prisoner, civilly committed sex offenders likewise "do not retain rights inconsistent with their status."

The law concerning visitation and freedom of association rights for inmates is a useful starting point for the Court's analysis. A civil detainee of MSOP "is not a prisoner per se, [but] his confinement is subject to the same safety and security concerns as that of a prisoner." As such, courts often analyze constitutional claims brought by involuntarily committed individuals via analogy to claims brought in the prison context. The Eighth Circuit has determined that MSOP's civil detainees are most similar to pretrial detainees for the purpose of assessing constitutional protections. Thus, where possible, the Court considers [the plaintiff's] situation in that context.

. . .

The Supreme Court has upheld blanket prohibitions on contact visitation between pretrial detainees and any other individual, regardless of relationship. However, the claims in *Block* were based on the Fourteenth Amendment, not the First, a fact highlighted in the dissent. Although the Supreme Court has said that freedom of association is "among the rights least compatible with incarceration," it has in the same breath declined to define the parameters of the right to association that survives incarceration.

The Eighth Circuit has stated that civil detainees are "entitled to more considerate treatment and conditions of confinement" than prisoners. Therefore, "if prisoners continue to have some freedom of association rights, civilly committed individuals at the MSOP must also have such rights." Although the jurisprudence regarding the extent of a civil detainee's right to visitation through the First Amendment is far from settled, the case law indicates that some version of such a right exists and the defendants have failed to establish otherwise. Accordingly, the Court finds that [the plaintiff] has pleaded a violation of his First

20

> Amendment right to freedom of association well enough to
> survive the motion to dismiss stage.

*Meyer*, 2019 WL 4675353, at *3 (footnote and citations omitted).  This analysis is less than a year old, and after reviewing it, the Court sees no reason to depart from it here.  As a result, the Court finds that Mr. Mason has adequately pled the existence of a First Amendment visitation right to survive dismissal at this stage.

In the Court's view, two points from Defendants' briefs merit further attention, though neither persuades.  First, Defendants note that *Meyer*, *Williams*, and *Knutsen* "all involved visitation with family members, and [Mr. Mason] does not allege Keinanen is a family member."  Mem. 15 n.16.  The Court does not find this distinction persuasive.  To be sure, *Knutson* and *Williams* do consider visitation rights in light of constitutional rulings concerning the importance of family.  *See Williams*, 2015 WL 1333991, at *6–8; *Knutson*, 2011 WL 821253, at *7–9.  But it is not obvious why family-member status should decide, per se, whether an MSOP detainee has *any* sort of First Amendment visitation rights with a given visitor.  And Defendants have not offered authority to support a finding that a family relationship is dispositive as to the existence of a right to visitation.

Second, Defendants emphasize the Eighth Circuit's statement, in *Revels v. Vincenz*, that "[a]lthough an involuntarily committed patient of a State hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."  382 F.3d 870, 874 (8th Cir. 2004); *see also* Mem. 16–17; Reply 3–4.  But this observation does not help Defendants.  Had the Supreme Court clearly stated that

prisoners have no First Amendment visitation rights, then maybe *Revels* would be dispositive for MSOP clients as well. But as this Court pointed out in *Meyer*, the Supreme Court has *not* said that prisoners lack First Amendment visitation rights; instead, it left the question open. 2019 WL 4675353, at *3 (citing *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003)). If anything, the *Revels*-imposed guidance runs the other way: if prisoners appear to have some sort of vaguely defined right of freedom of association, then *Revels* suggests that MSOP clients should have the same.[12]

### 2.   Issue Preclusion

Defendants contend that, given the *Karsjens* litigation, issue preclusion bars Mr. Mason's visitation-policy challenge. *See* Mem. 19–22. Issue preclusion "generally provides that '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 912 F.3d 445, 452 (8th Cir. 2018) (*B&B Hardware II*) (quoting *B&B Hardware, Inc. v. Hargis Indus, Inc.*, 135 S. Ct. 1293, 1303 (2015) (brackets in *B&B Hardware II*)). In the Court's view, the nature of Mr. Mason's First Amendment claims—namely, that they are as-applied claims—makes issue preclusion a nonstarter.

---

[12] Defendants argue in a footnote in their Memorandum that "[t]o the extent [Mr. Mason] asserts he has a constitutional right to visitation with Keinanen based on Minn. Stat. § 253B.03, subd. 3, that argument lacks merit." Mem. 16 n.16. The Court does not construe Mr. Mason as arguing that his First Amendment visitation right hinges on this Minnesota statutory provision.

The Eighth Circuit's issue-preclusion test has five elements:

> (1) the party sought to be precluded in the second suit was a party . . . in the prior suit; (2) the issue sought to be precluded is the same as the issue involved in the prior action; (3) the issue was actually litigated in the prior action; (4) the issue was determined by a valid and final judgment; and (5) the determination in the prior action was essential to the judgment.

*Id.* at 452 (quoting *Morse v. Comm'r of Internal Revenue Serv.*, 419 F.3d 829, 834 (8th Cir. 2005) (ellipses in *B&B Hardware II*; internal quotation marks omitted)).

The Court need not analyze all five elements here. Instead, it will start and stop with Defendants' assertion that "the issue [Mr. Mason] seeks to litigate was at issue and actually litigated in *Karsjens*." Mem. 20. The Court strongly disagrees. The relevant *Karsjens* discussion makes crystal clear that the *Karsjens* litigation posed facial challenges to various MSOP policies (including the visitation policy), not as-applied challenges to specific policy applications:

> The same modified *Turner* analysis outlined above applies to claims that certain institutional policies inhibit committed individuals' First Amendment freedom-of-speech and association rights. The MSOP's media policy restricting access to certain objectionable content has been deemed constitutional within this District. Similarly, an MSOP mail policy permitting the inspection of mail and an MSOP telephone policy imposing charges for calls and permitting monitoring have survived First Amendment scrutiny under *Turner*.
>
> Defendants argue that the MSOP's policies challenged in [Plaintiffs' First Amendment count] should be upheld consistent with governing Eighth Circuit precedent and multiple cases out of this District. Specifically, Defendants point to caselaw which has upheld the MSOP's mail policy, phone policy, media policy, and vendor policy against First

> Amendment challenge.  Contrary to Plaintiffs' position, Defendants argue, "there is no legal authority for [the Plaintiffs'] belief that the conglomeration of a number of constitutional policies can result in something unconstitutional."
>
> Plaintiffs contend that the MSOP's policies infringe their speech and association rights under the First Amendment.  According to Plaintiffs, "[w]hen all of the MSOP's policies and practices affecting Plaintiffs' freedom of speech and association are considered together, it is clear that the MSOP does not limit its restrictions to those that are necessary for therapeutic or security reasons."  In particular, Plaintiffs point to the MSOP's mail policy, visitation policy, media policy, and phone policy.  Plaintiffs dispute Defendants' safety and security justification for such policies, arguing that Defendants offer only conclusory assertions.
>
> . . . . [T]he Court concludes that summary judgment is warranted on Plaintiffs' First Amendment claims in Count IX. . . .  Plaintiffs have failed to raise a genuine dispute over whether Defendants' policies implicating speech and association are an unreasonable restriction on Plaintiffs' First Amendment rights as applied to the Class as a whole. . . .

*Karsjens v. Piper*, 336 F. Supp. 3d 974, 993 (D. Minn. 2018) (cleaned up; citations omitted).  This discussion indicates that the *Karsjens* court saw itself as addressing facial challenges to MSOP policies.  But even if the discussion here were unclear, *Karsjens* specifically stated in a footnote that "the Court's conclusions on the viability of Plaintiffs' freedom-of-speech and association claims in this case are not meant to foreclose committed individuals at the MSOP from advancing individual freedom-of-speech and association claims in separate litigation."  *Id.* at 994 n.13.  *Karsjens* could hardly have been more clear: it was not meant to preclude future as-applied challenges to the relevant MSOP policies.

24

As a result, the Court fully agrees with Mr. Mason when he states that "[e]ven though [he] was a class member in [*Karsjens*], the issues [he] seeks to litigate were not at issue and were not fully litigated" there. Resp. 16. The Court thus rejects Defendants' issue-preclusion argument.[13]

### 3. Constitutionality of the Policies as Applied

Defendants next argue that they applied MSOP's visitation and telephone-use policies constitutionally with respect to Ms. Keinanen, and therefore Mr. Mason's First Amendment claims should be dismissed. *See* Mem. 23–30.

### The *Turner* Standard

Defendants contend that to analyze Mr. Mason's First Amendment claims, this Court should use a "modified version of the test outlined in [*Turner*]." *Id.* at 17. In *Turner*, the Supreme Court considered the claims of convicted prisoners challenging various prison regulations issued by a state corrections department. 482 U.S. at 81. The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. It fleshed out this standard with a four-factor test: courts assessing a regulation's constitutionality should consider (1) whether "there [is] a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right open to prison

---

[13] Defendants also assert that, even if their issue-preclusion argument does not carry the day, *Karsjens* found their visitation policy to be constitutional. Mem. 22. However, because Mr. Mason is raising an as-applied challenge rather than a facial one, the *Karsjens* decision does not foreclose Mr. Mason's claim.

inmates"; (3) "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "obvious, easy alternatives" to the challenged regulation. *Id.* at 90–91 (internal quotation marks and citations omitted).

The present situation differs from *Turner*, of course, because *Turner* concerned prisoners, not civilly committed individuals such as MSOP clients. Numerous cases in this District indicate that a "modified" *Turner* test is the proper lens to assess MSOP-client claims under the First Amendment. *See, e.g.*, *Meyer*, 2019 WL 4675353, at *3–4; *Williams*, 2015 WL 1333991, at *7–8; *Knutson*, 2011 WL 821253, at *8–9. The modifications that courts have applied to *Turner* in this context stem from shifting *Turner*'s prisoner-based test to the more expansive rights of civilly committed persons. Under the modified *Turner* test, the underlying question is not whether a given regulation is reasonably related to legitimate *penological* interests—the standard for regulations governing prisoners—but whether the regulation is reasonably related to legitimate *institutional* or *therapeutic* interests. *See, e.g.*, *Miles v. Johnson-Piper*, No. 19-CV-1078 (WMW/KMM), 2020 WL 2362044, at *5 (D. Minn. Jan. 23, 2020), *report and recommendation adopted in relevant part*, 2020 WL 1330028 (D. Minn. Mar. 23, 2020); *Ivey v. Mooney*, No. 05-CV-2666 (JRT/FLN), 2008 WL 4527792, at *5 (D. Minn. Sept. 30, 2008).

Under the modified *Turner* test, the four factors are:

(1) whether the MSOP policy at issue bears a rational relationship to legitimate institutional and therapeutic interests;

26

      (2)      whether the MSOP client has alternative means of
                    exercising the First Amendment right at issue;

      (3)      whether and to what degree accommodation of the
                    right would impact the institution, resources, staff, and
                    other clients; and

      (4)      whether simple and cost-effective alternatives exist
                    that would meet MSOP's objectives.

*Stone v. Jesson*, No. 11-CV-0951 (WMW/HB), 2019 WL 7546630, at *5 (D. Minn. Dec. 3, 2019) (citing *Ivey*, 2008 WL 4527792, at *5, *10), *report and recommendation adopted*, 2020 WL 109775 (D. Minn. Jan. 9, 2020); *see also Meyer*, 2019 WL 4675353, at *4 (presenting similar list (citing *Ivey*)).  The Court adopts that framework in this case.[14]

    Against this backdrop, the Court considers Mr. Mason's challenges to both the visitation and the phone policy.

### Visitation-Policy Challenge

    With respect to Mr. Mason's visitation-policy challenge, Defendants argue that Mr. Mason has failed to state a claim under the modified *Turner* standard.  *See* Mem. 23–25.  Mr. Mason argues, among other things, that the Court lacks the factual record needed to properly apply the modified *Turner* standard.  *See* Resp. 17–18.

    The Court agrees with Mr. Mason.  When deciding a motion to dismiss, a court may only consider the complaint's factual allegations.  *See, e.g.*, *Knutson*, 2011 WL 821253 at *9.  At this stage, the Court cannot meaningfully weigh the *Turner* factors; the

---

[14] As the Court understands the Response, Mr. Mason agrees that a modified version of the *Turner* test should apply to his First Amendment claims.  *See* Resp. 12–13.

parties have yet to develop the needed record. *See, e.g.*, *Beaulieu v. Ludeman*, No. 07-CV-1535 (JMR/JSM), 2008 WL 2498241 at *20 (D. Minn. June 18, 2008) (denying motion to dismiss because record was insufficient to evaluate *Turner* factors). Unsurprisingly, Defendants argue that MSOP's visitation policy serves a legitimate therapeutic interest, and that this interest applies specifically to Mr. Mason's relationship with Ms. Keinanen. But for motion-to-dismiss purposes, the Court cannot simply assume that Defendants' arguments prevail. Indeed, several courts in this district have concluded that analyzing the *Turner* factors at the motion-to-dismiss stage is premature. *See Meyer*, 2019 WL 4675353, at *4; *Stone*, 2017 WL 1050393 at *4; *Williams*, 2015 WL 1333991 at *7; *Knutson*, 2011 WL 821253 at *9; *Beaulieu*, 2008 WL 2498241 at *20. Given these considerations and this caselaw, the Court concludes that it cannot dismiss Mr. Mason's First Amendment visitation claim under the modified *Turner* test at the present time.[15]

---

[15] In a footnote, Defendants state that Mr. Mason "does not specify who issued or caused the 'notice of Approved/Denied visitors' informing him that Keinanen 'was denied' prior to Defendant Moser's alleged affirmation of the denial." *See* Mem. 24 n.15. The idea, apparently, is that because Mr. Mason does not identify that person, Ms. Keinanen's visitor-status denial cannot ground a properly alleged First Amendment claim. The Court disagrees. If all that Mr. Mason alleged about the visitation ban were that someone issued him the denial, this identification issue could be a problem. (One easily fixed, though: Mr. Mason could simply add, as presently unknown "John Doe" defendants, whoever drafted and issued the denial.) But that point is academic. Mr. Mason alleges that after receiving the denial, he communicated with specific Defendants about the visitation ban. *See* Compl. 5–10 (communication with Mr. Moser); *see also id.* at 20–22 (communication with Ms. Johnston). Mr. Mason got responses to his communications; these did not alter the visitations ban. *See id.* at 5, 22. Because those allegations refer to specific Defendants, the Court sees no failure of specificity here.

**Telephone-Use-Policy Challenge**

Defendants similarly argue that under the modified *Turner* test, applying MSOP's telephone-use policy to block Ms. Keinanen's calls was constitutional. *See* Mem. 25–30. For the same reasons that it is premature to dismiss Mr. Mason's as-applied challenge to MSOP's visitation policy, it is also premature to dismiss his as-applied challenge to its telephone-use policy. Simply put, the Court cannot apply the modified *Turner* test on the present record.

The Eighth Circuit's opinion in *Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012), relied upon heavily by Defendants, does not require a different result. *Beaulieu* affirmed a district-court grant of summary judgment in favor of various MSOP-affiliated defendants; the plaintiffs there raised constitutional challenges to several MSOP policies, including MSOP's telephone-use policy. *See id.* at 1021–22. On appeal, the plaintiffs challenged, among other things, the district court's finding that "the MSOP's telephone policy, as it applies to privileged communications, is rationally related to the legitimate penological interests of security and conserving limited staff resources." *Id.* at 1022.

But far from supporting Defendants' position, *Beaulieu* instead establishes why dismissal is inappropriate at this stage. First, *Beaulieu* considered a facial challenge to the telephone-use policy, not an as-applied challenge like Mr. Mason's. But even more relevant, the *Beaulieu* court applied *Turner* to a record developed by discovery at the summary-judgment stage. *See generally id.* at 1037–1041 & nn.13–14. In fact, the Eighth Circuit explicitly relied on affidavits or deposition testimony from at least three different MSOP-affiliated entities in applying the *Turner* test. Nothing in the decision

29

suggests that the Eighth Circuit thought it could have applied the *Turner* test to the pleadings alone.

Defendants also suggest that the Complaint presents all the facts this Court needs to do the modified *Turner* analysis.  *See* Mem. 27–30; Reply 4–5.  The argument appears to be that (1) Mr. Mason himself alleges that most or all of the responses that he received after his complaints state that MSOP staff blocked his calls for institutional and therapeutic purposes; (2) institutional and therapeutic purposes are legitimate government purposes under the modified *Turner* test; and so (3) the Complaint itself provides enough material to apply the modified *Turner* test.

This argument falls flat for numerous reasons.  Most importantly for present purposes, the first modified-*Turner* factor is not whether institutional and therapeutic purposes are legitimate governmental purposes, but whether there is a "valid, rational connection" between Defendants' conduct and the whatever governmental purposes supposedly justify the conduct.  The Court has no doubt that Defendants can—and at summary judgment, will—point to numerous institutional and therapeutic reasons why blocking Ms. Keinanen's calls was appropriate.  But the pleadings alone cannot tell the Court whether Defendants' application of its policy in this case has a "valid, rational connection" to those justifications.

In summary, the Court rejects Defendants' arguments that Mr. Mason has failed to state a First Amendment claim against Defendants.

### E.    Fourteenth Amendment Claims

### 1.    Procedural-Due-Process Claims

As discussed above, the Court construes the Complaint as presenting four due-process claims: a procedural-due-process claim and a substantive-due-process claim about MSOP staff applying the visitation policy, and a similar pair of claims about MSOP staff applying the telephone-use policy.  The Court will start with the procedural-due-process claims.

The parties agree that to plead a procedural-due-process violation, Mr. Mason must satisfy a two-element test: he must allege that he (1) had a protected interest, and (2) was deprived of it without "due process of law."  *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (citing cases); *Semler v. Johnston*, No. 17-CV-2822 (ECT/LIB), 2019 WL 7580107, at *6 (D. Minn. Aug. 2, 2019) (reciting similar test (quoting *Schmidt v. Des Moines Public Schs.*, 655 F.3d 811, 817–18 (8th Cir. 2011)), *report and recommendation adopted*, 2019 WL 5854039 (D. Minn. Nov. 8, 2019).

Against this backdrop, Defendants state that "there is no actionable procedural due process claim against any Defendant because the grievance procedure available to [Mr. Mason]—which he does not even allege he availed himself of concerning the alleged denial of visitation—is an adequate state post-deprivation remedy that forecloses [Mr. Mason's] claim . . . ."  Mem. 30.  The Court understands this sentence to raise two arguments.  First, Defendants suggest for both of Mr. Mason's procedural-due-process claims, MSOP's grievance procedure "is an adequate state post-deprivation remedy that forecloses [Mr. Mason's] claim for the violation of the right to procedural due process."

*Id.* at 30–31.  This challenges whether Mr. Mason has sufficiently alleged—for either of his procedural-due-process claims—such a claim's second element.  Second, Defendants appear to also argue that for Mr. Mason's procedural-due-process claim based on MSOP's visitation policy, a dispositive affirmative defense—failure to exhaust—is plain from the face of the Complaint.  *Cf. Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 437 F. Supp. 3d 693, 705 (D. Minn. 2020) (stating that "dismissal for failure to state a claim based on an affirmative defense is appropriate only when the defense is established on the face of the complaint" (citing *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)).

The Court will first address whether Mr. Mason has sufficiently pleaded procedural-due-process claims.  To assess whether one has received "due process of law," a court considers three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson v. Austin*, 545 U.S. 209, 224–25 (2005) (quoting *Mathews v. Eldredge*, 424 U.S. 319, 335 (1976)); *see also Lunon v. Botsford*, 946 F.3d 425, 431 n.3 (8th Cir. 2019) (noting similar factors (quoting *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998)).  In this case, the Court has the same problem applying this test that it had in applying the

modified *Turner* test to Mr. Mason's First Amendment claims: the Court cannot conclude from the pleadings that MSOP's grievance procedure is adequate.[16]

This leaves Defendants' failure-to-exhaust affirmative defense. The idea here is that, for Mr. Mason's visitation-based procedural-due-process claim, the Complaint does not allege that Mr. Mason submitted a grievance, meaning that he has failed to exhaust his administrative remedies. *See* Mem. 30.

In *Wax 'n Works v. City of St. Paul*, the Eighth Circuit held, generally, that "[u]nder federal law, a litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983." 213 F.3d 1016, 1019 (8th Cir. 2000) (citing decisions from other courts of appeals); *see also Does 1–2 v. Regents of the Univ. of Minnesota*, No. 18-CV-1596 (DWF/HB), 2019 WL 2601801, at *8 (D. Minn. June 25, 2019) (citing *Wax 'n Works*); *Statham v. City of Saint Paul*, No. 13-CV-03570 (MJD/HB), 2015 WL 1457540, at *4 (D. Minn. Mar. 30, 2015) (same). Confronted with Defendants' argument that he failed to exhaust his remedies for his visitation-based procedural-due-process claim, Mr. Mason provides no counterargument. *See* Reply 22–24 (containing procedural-due-process section; no suggestion that Mr. Mason exhausted visitation-based claim or that Complaint failed to

---

[16] This is particularly true with respect to Mr. Mason's telephone-use-policy claim, because the Complaint appears to raise specific concerns about how Defendants used MSOP's grievance procedure to address Mr. Mason's inquiries about the telephone-use policy. *See* Compl. 10–33. Specifically, Mr. Mason repeatedly asked MSOP staff to justify their decision to block phone calls from Ms. Keinanen, and Defendants allegedly refused to provide a substantive response. There may well be good reasons for this, of course, but the Court cannot conclude *from the pleadings* that such reasons not only exist, but dispose of Mr. Mason's telephone-use-policy claim.

include relevant grievance).  As a result, the Court concludes that it is indeed clear from the face of the Complaint that Defendants' exhaustion-based affirmative defense applies here.  The Court therefore recommends that Mr. Mason's procedural-due-process claim based on MSOP's visitation policy be dismissed.

## 2.    Substantive-Due-Process Claims

As noted above, the Court construes the Complaint as including two substantive-due-process claims: one for how MSOP staff applied MSOP's visitation policy, one for how they applied its telephone-use policy.  In the Court's view, however, Mr. Mason fails to state a substantive-due-process claim in either respect.

The Fourteenth Amendment's Due Process Clause "cover[s] a substantive sphere . . . , 'barring certain government actions regardless of the fairness of the procedures used to implement them.'"  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  But this sphere is limited: "[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 72 (2009) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)); *see also Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (quoting similar portion of *Collins*).

To allege a substantive-due-process violation, a plaintiff must allege that government action infringed on a "fundamental right."  *See, e.g.*, *Van Orden v. Stringer*, 937 F.3d 1162, 1167 (8th Cir. 2019) (citing cases); *Gallagher*, 699 F.3d at 1017.  "A

34

fundamental right is one which is, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed." *Gallagher*, 699 F.3d at 1017 (quoting cases (internal quotation marks, citations, and brackets omitted)); *see also Van Orden*, 937 F.3d at 1167–68 (giving same standard (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

The relevant government action must also be "'shocking to the contemporary conscience.'" *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010)); *see also Munt v. Schnell*, No. 18-CV-3390 (DWF/ECW), 2020 WL 1695420, at *15 (D. Minn. Jan. 31, 2020) (making same point (quoting *Hall v. Ramsey Cty.*, 801 F.3d 912, 917 (8th Cir. 2015)), *report and recommendation adopted*, 2020 WL 968353 (D. Minn. Feb. 28, 2020). Given this standard, an alleged substantive-due-process violation must be "so severe[,] . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience." *C.N.*, 591 F.3d at 634 (quoting *Golden v. Anders*, 324 F.3d 650, 652–53 (8th Cir. 2003) (ellipses in *C.N.*)); *see also Miles v. Johnson-Piper*, No. 19-CV-1078 (WMW/KMM), 2020 WL 1330028, at *5 (D. Minn. Mar. 23, 2020) (reciting same standard (quoting *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017)).

The Complaint here alleges that MSOP staff inappropriately applied MSOP's visitation policy to stop Ms. Keinanen from visiting Mr. Mason, and inappropriately

applied the telephone-use policy to prevent phone contact.  The Court need not decide whether visitation and phone contact with Ms. Keinanen could ever been considered a fundamental right because the alleged conduct here is simply not conscience-shocking. The Complaint thus fails to allege that Defendants violated Mr. Mason's Fourteenth Amendment substantive-due-process rights, and the Court therefore recommends dismissing the Complaint's substantive-due-process claims without prejudice.

## F.    Qualified Immunity

Finally, Defendants argue that the individual Defendants merit qualified immunity.  When officials act unconstitutionally, but due to a reasonable misunderstanding or misinterpretation of the relevant law, they are entitled to qualified immunity, which protects them from liability for damages.  *See, e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *Meyer*, 2019 WL 4675353, at *5.  But qualified immunity does not apply if (1) officials deprived the plaintiff of a constitutional or statutory right, and (2) the right was "clearly established," meaning that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011) (internal quotation marks omitted)); *see also Meyer*, 2019 WL 4675353, at *5 (citing *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007)).  Whether qualified immunity applies in a given case is a question of law.  *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 526–28 (1985); *Kelsay v. Ernst*, 933 F.3d 975, 981 (8th Cir. 2019) (en banc).

The first qualified-immunity prong is met here, as the Court has determined that Mr. Mason has adequately pleaded constitutional violations.  But the discussion above also shows that Mr. Mason's relevant First Amendment and Fourteenth Amendment rights are not so clearly established that any reasonable official would know that their conduct was unlawful.  *See generally* Sections II.D, II.E.1 *supra*.  Even if all of the Complaint's allegations are true, qualified immunity protects the individual defendants from damages liability here.  The Court thus recommends dismissing any claims for damages from the remaining individual Defendants (i.e., Nancy Johnston, Kevin Moser, Terry Kneisel, Steve Sayovitz, Jordan Goodman, and Jim Berg) in their individual capacities.

The dismissal of these claims should be with prejudice.  Mr. Mason cannot fix the key problem with these claims through repleading.  No matter what Mr. Mason pleads about how these defendants interfered with his ability to visit with, or speak by phone with, Ms. Keinanen, the rights that he is relying on are not clearly established.  Because repleading cannot fix these issues, dismissal of these claims with prejudice is appropriate.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendants' Motion to Dismiss Plaintiff's Complaint (ECF No. 11) be **GRANTED** in the following respects:

    a.  Any claims in Plaintiff Ricky Mason's Complaint seeking damages from the individual Defendants in their official

capacities be **DISMISSED** without prejudice for lack of jurisdiction.

b.      Any claims in the Complaint against Defendant Minnesota Department of Human Services be **DISMISSED** without prejudice for lack of jurisdiction, and Defendant Minnesota Department of Human Services be dismissed from this action.

c.      Any claims in the Complaint against Defendant Thane Murphy be **DISMISSED** without prejudice, and Mr. Murphy be **DISMISSED** from this action.

d.      Any claims in the Complaint against Defendants Blake Carey and Randy P. Gordon based on the Complaint's allegation that they "punished [Mr. Mason] by assigning him restrictions after [Mr. Carey]" gave Mr. Mason the Behavioral Expectations Report dated September 19, 2017, are **DISMISSED** without prejudice.

e.      The Complaint's procedural-due-process claim addressing how Defendants applied MSOP's visitation policy be **DISMISSED** without prejudice.

f.      Any claims in the Complaint resting on substantive due process be **DISMISSED** without prejudice.

g.      Any claims seeking damages from the remaining individual Defendants (i.e., Nancy Johnston, Kevin Moser, Terry Kneisel, Steve Sayovitz, Blake Carey, Randy P. Gordon, Jordan Goodman, and Jim Berg) in their individual capacities be **DISMISSED** with prejudice.

2.      The Motion be otherwise **DENIED**.


Date: July 27, 2020                          s/ *Katherine Menendez*
                                                 Katherine Menendez
                                                 United States Magistrate Judge

**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).