## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RICKY MASON,

                                                    Civil No. 19-2597 (JRT/HB)

                            Plaintiff,

v.                                      **MEMORANDUM OPINION AND ORDER
                                        GRANTING IN PART AND DENYING IN
NANCY JOHNSTON, et al.,                 PART DEFENDANTS' MOTION FOR
                                        SUMMARY JUDGMENT**

                            Defendants.

Ricky Mason, Minnesota Sex Offender Program, 1111 Highway 73, Moose Lake, MN 55767, *pro se* plaintiff.

Leonard J. Schweich, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, Saint Paul MN, 55101, for defendants.

Plaintiff Ricky Mason is civilly committed at the Minnesota Sex Offender Program ("MSOP") facility at Moose Lake, Minnesota. He alleges that Defendants Nancy Johnston, Kevin Moser, Terry Kneisel, Steve Sayovitz, Blake Carey, Randy Gordon, Jordan Goodman, and Jim Berg (collectively "Defendants") violated his First Amendment right of freedom of association and his Fourteenth Amendment right to procedural due process by preventing him from making phone calls to or receiving visits from a former MSOP staff member. Defendants have moved for summary judgment on all claims against them.

The Court will grant in part and deny in part the Defendants' motion for summary judgment. There remains a factual dispute regarding whether the Defendants' decision to limit Mason's communication with the former staff member was justified and the Court

will deny the motion as to the First Amendment claim.  However, the Defendants provided Mason with adequate notice and opportunity to challenge the decision to block his calls and the Court will grant the motion and dismiss the Fourteenth Amendment claim.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

Mason was civilly committed to the MSOP in Moose Lake in 2012 and remains there today.  *In re Civil Commitment of Mason,* No. A11-1862, 2012 WL 426615, at *1 (Minn. Ct. App. Feb. 13, 2012).  Until 2014, Mason was actively in treatment at the program, doing therapeutic assignments and attending counseling.  (Decl. of Brenden Kenny, Ex. 1 ("Mason Dep.") at 61:24, June 25, 2021, Docket No. 75.)  In 2014, Mason ceased treatment because he "didn't see any merit in it." (*Id.* at 61:24–62:1) Mason resumed treatment in either 2020 or 2021.  (*Id.* at 62:1–2.)

**A.      MSOP Policies and Procedures**

MSOP is tasked with providing a "safe environment for staff, program participants, and visitors."  Minn. R. 9515.3040, subd. 2.  To that end, MSOP has instituted policies to regulate the environment in its facilities.

### 1.   MSOP Policies

Three MSOP policies are relevant here.  First, MSOP prohibits its staff members from having business, non-work related, or social relationships with MSOP clients.[1]  (Decl. of David Bornus ("Bornus Decl."), Ex. 12, June 25, 2021, Docket No. 69-1.)  Staff may not date clients, engage in sexual acts or sexually suggestive expression with clients, or share personal or familial information with clients such as marital status, phone numbers, or home addresses.  (*Id*.)  MSOP has determined that violation of these boundaries hampers the therapeutic progression of MSOP clients and threatens the safety and security of MSOP facilities.  (Decl. of Kevin Moser ("Moser Decl.") ¶ 13, June 25, 2021, Docket No. 78.)

Even former staff members are restricted in their capacity to visit and call MSOP clients.  There is a presumption against allowing former MSOP staff members to visit clients, and MSOP therapists may request that former staff members' phone numbers be blocked so clients cannot call them.  (Bornus Decl., Ex. 10 at 7, Ex. 17 at 6.)

Second, MSOP clients are statutorily permitted to receive visitors provided that MSOP does not determine that the visitations are contrary to the medical welfare of the client.  Minn. Stat. § 253B.03, subd. 3.  A potential visitor sends an application, and MSOP staff assess the visitor's potential impact on the client's therapeutic progression and the facility's safety.  (Bornus Decl., Ex. 10 at 1–2; Decl. of Allison Collins ¶ 7, June 25, 2021,

---

[1] MSOP refers to civilly committed offenders as "clients."

Docket No. 71.)  Admitted visitors must go through several security procedures including metal detectors and pat downs during their visit.  (Id. at 4–6.)

Third, similar to visitation, MSOP clients are statutorily permitted to make telephone calls provided that MSOP does not determine that the calls are contrary to the medical welfare of the client or other general rules of the facility.  Minn. Stat. § 253B.03, subd. 3.  MSOP does not permit its clients to receive calls, instead the clients may make outgoing calls.  (Bornus Decl., Ex. 17 at 2–3.)  MSOP staff may recommend restrictions on calls including blocking certain numbers so clients cannot speak to a particular person. (*Id.* at 6.)  Following an escape that was orchestrated by telephone, MSOP began to record all clients' non-privileged calls with people outside the facility.   (Moser Decl. ¶ 9.) Nonetheless, MSOP does not have the staff or resources to monitor every call.  (*Id*. ¶ 10.)

### 2.   MSOP Procedures

When an MSOP client violates policies or exhibits counter-therapeutic or unsafe behavior, MSOP staff issue the client a Behavior Expectations Report ("BER").  (Decl. of Jordan Goodman ¶ 3, June 25, 2021, Docket No. 72.)  The BER details the client's problematic behavior and gives the client notice of a BER Panel hearing during which the client may rebut claims made against them.  (*See id.*)  Clients may appeal a BER using the MSOP grievance process.  (*Id.*)  The grievance process also offers clients an opportunity to raise concerns and complaints or resolve other issues.  *See* Minn. Stat. § 246B.03, subd. 3.

**B.      Mason's Relationship with Keinanen**

In 2014, Mason appeared to be developing a relationship with MSOP staff member Cara Keinanen.  (Mason Dep. at 16:18.)  By 2015, the relationship had progressed to the point that MSOP personnel were concerned that it might violate MSOP's client-staff boundary policy.  (Decl. of Anita Moonen, Ex. 4 ("Incident Reports") 4–24, June 24, 2021, Docket No. 64.)[2]

Beginning in 2016, MSOP personnel listened to several of Mason's telephone calls where he spoke with a woman he sometimes referred to as "Hope."  (*Id.* at 25, 45.)  Several MSOP personnel recognized the woman's voice as Keinanen's.  (*e.g.*, *id*. at 25–26.)  Because clients are not able to dial MSOP employees' numbers, Mason would call a Google number that would then reroute the call to Keinanen's phone.  (Mason Dep. at 46:10–11.)

Keinanen and Mason developed a strong emotional bond.  Keinanen talked with Mason about how his mother was doing and was with Mason's mother while speaking to him on at least one occasion.  (Incident Reports at 29.)  They spoke about their children and the struggles of parenting children with mental health issues.  (*Id.* at 42.)  On occasion their conversation involved sexual inuendoes and banter.  (*E.g.*, *Id.* at 32.)

---

[2] Incident Reports page citations are to the ECF page number assigned to the page by the Court.

In February 2016, supervisors informed Keinanen that her relationship with Mason was inappropriate and instructed her to create distance from him.  (Moonen Decl., Ex 3. at AGO000001, June 25, 2021, Docket No. 63.)  By May 2016, Keinanen's supervisors determined that she had not satisfactorily complied with their instructions, so they reassigned Keinanen to a different unit to separate her from Mason.  (Incident Reports at 34–35.)  Nonetheless, Mason and Keinanen continued their relationship by telephone.  (*Id.* at 41–44.)  Finally, on June 27, 2016, Keinanen left her position at MSOP.  (*Id.* at 71–72.)[3]

### C.    Mason's Communications with Keinanen

Mason and Keinanen have attempted to stay in contact through visits, telephone calls, and letters.  Keinanen applied to visit Mason, but her applications have been denied.  (Moonen Decl., Ex. 5 at AGO0000161.)

Mason and Keinanen spoke by telephone on the day her job ended in 2016 and at least two more times that year.  (Incident Reports at 71, 74–75.)  Mason called Keinanen using different numbers between January and September of 2017.  (*Id.* at 78–91.)  Beginning in August 2017, MSOP blocked several numbers that Mason used to call Keinanen.  (Moonen Decl., Ex. 1 at AGO0000049–56.)  Mason and Keinanen continued to find ways to speak with one another.  (Incident Reports at 84.)   Whenever MSOP

---

[3] Defendants claim that they terminated Keinanen due to her relationship with Mason but provide no evidence supporting that contention.  (Defs.' Mem. Supp. Summ. J. Mot. at 14.)

discovered the calls, it blocked the numbers and informed Mason that a one-year block was placed on the number because his phone calls with Keinanen were interfering with his therapeutic progression and because communication between clients and former staff members was a threat to the facility's security.  (Moonen Decl., Ex. 1 at AGO0000049–56.)

Eventually, Mason's therapist met with him to discuss MSOP's decision to block Keinanen's numbers.  The therapist told him that the calls were a security risk because of Keinanen's knowledge of MSOP security procedures.  (Incident Reports at 89.)  Mason responded that Keinanen was important to him, that she helped take care of his mother, and kept him informed about how his family was doing. (*Id.*)  The therapist validated that it must be a relief for Mason to have someone to talk with about his mother but told him that his relationship with Keinanen blurred the line of professional and personal relationships and created a barrier to trusting his treatment team. (*Id.*)  Mason showed no intention of stopping his relationship with Keinanen and told his therapist to expect "a few more numbers to be blocked." (*Id.*)

In September 2017, MSOP staff issued a BER to Mason for his continued attempts to contact Keinanen.  (Moonen Decl., Ex. 2.)  At the BER hearing, Mason stated that he did not stop calling Keinanen because she was his support person.  (*Id.* at AGO0000002.)  He further stated that he would not stop trying to contact her. (*Id.*)  The BER panel issued a disciplinary movement restriction on Mason for five days.  (*Id.* at AGO0000003.)

The final reported block occurred in February 2019. (*Id.* at AGO0000042.)[4] Mason discovered the block and filed a grievance report requesting that the number be unblocked and asking why it was blocked. (*Id*.) The next week MSOP denied the grievance report and pointed Mason to the MSOP policy that permits blocking numbers of former MSOP staff. (*Id*.) Mason then appealed the decision. (*Id.* at AGO0000040) MSOP denied the appeal because Mason "was involved in an inappropriate relationship with [Keinanen]." (*Id.* at AGO0000043.)

Mason and Keinanen are still allowed to exchange letters with one another and do so from time to time. (Mason Dep. at 123:24–124:9.) For now, that appears to be the only method of communication available to them.

## II.   PROCEDURAL HISTORY

Mason brought this action against several individuals in their personal and official capacities and against the Minnesota Department of Human Services ("MDHS") seeking monetary damages and injunctive relief. (Compl., Sept. 25, 2019, Docket No. 1.) He alleges violations of his First Amendment freedom of association rights and of his Fourteenth Amendment procedural and substantive due process rights. (*Id*.) Defendants

---

[4] Although the number blocks issued in August and September 2017 were not due to expire until 2018, Mason was able to call Keinanen again beginning sometime in 2017. (Moonen Decl., Ex. 1 at AGO0000023.). It is unclear from the record exactly how he was able to resume calling her—whether because the blocks expired early, did not work, he called different numbers, or something other reason.

moved to dismiss the complaint, and the Court granted the motion as to (1) the claims against MDHS, (2) the claims against one of the individuals, (3) all claims seeking damages from the individuals in their personal capacities, (4) the substantive due process claims, and (5) the procedural due process claim addressing how Defendants denied Keinanen's visitation applications but denied the motion on all other claims.  (Mem. Op. & Order Adopting R. & R., Sept. 30, 2020, Docket No. 26; R. & R., July 27, 2020, Docket No. 23.)

The claims that remain in the case are (1) a First Amendment claim concerning the denial of visitation and telephone calls with Keinanen and (2) a Fourteenth Amendment procedural due process claim concerning the blocking of Keinanen's phone numbers which occurred in 2017 and 2019.  Defendants filed a Motion for Summary Judgment on both remaining claims.  (Defs.' Mot. for Summ. J., June 25, 2021, Docket No. 60.)

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine disputes of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. At the summary judgment stage, the Court will not make credibility determinations or weigh the evidence before it. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

When considering a summary judgment motion, pleadings submitted by pro se litigants are to be liberally construed and must be held to a less stringent standard than formal pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, pro se litigants are not excused from failing to comply with substantive or procedural law. *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984).

## II.    ANALYSIS

Mason claims that the Defendants violated his First Amendment rights by preventing him from calling and receiving visits from Keinanen, and that they violated his Fourteenth Amendment rights by failing to provide adequate due process when they blocked Keinanen's numbers.

A.    **First Amendment Claim**

The First Amendment enshrines the right to freely associate just as it protects one's

right to freedom of speech.  *Wingate v. Gage Cnty Sch. Dist.*, 528 F.3d 1074, 1081 (8th Cir.

2008).  Nonetheless, "[a]ny form of involuntary confinement, whether incarceration or

involuntary commitment, may necessitate restrictions on [one's First Amendment

rights]."  *Beaulieu v. Ludeman*, 690 F.3d 1017, 1038–39 (8th Cir. 2012) (emphasis omitted).

However, the constitutional rights of the civilly committed are not as limited as those of

the criminally incarcerated.  *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

The Eighth Circuit has applied the four factor *Turner* test to evaluate First Amendment

claims brought by civilly committed persons.  *E.g.*, *id*; *Ivey v. Mooney*, 2008 WL 4527792,

at *5 (D. Minn. Sept. 30, 2008).[5]

In the civilly committed context, the *Turner* test weighs four factors to determine

whether a First Amendment restriction is reasonably related to MSOP's legitimate

**institutional and therapeutic** interests.  *Ivey v. Mooney*, 2008 WL 4527792, at *5 (D.

Minn. Sept. 30, 2008).  The first and most important *Turner* factor asks whether there is

a valid, rational connection between the restriction and the legitimate institutional and

---

[5] The *Turner* test, as established in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987) does not
directly apply here because it pertains to prisons' First Amendment regulations and Mason is not
a prisoner.  However, a modified version of the test is useful to balance the restricted
constitutional rights of civilly detained persons against MSOP's interests.  *Ivey*, 2008 WL 4527792
at *5.  Moreover, as in *Beaulieu*, the parties here both advance arguments based on the *Turner*
factors.  *See Beaulieu*, 690 F.3d at 1039.  Therefore, the Court looks to the *Turner* factors as a
guide for its analysis.

therapeutic interest it purports to advance.  *Simpson v. Cty. of Cape Giradeau*, 879 F.3d

273, 279 (8th Cir. 2018).  If the Court finds a rational connection, then it "balance[s] the

remaining three factors."  *Id.*  Those remaining factors examine: (1) whether the client

has an alternative means of exercising the constitutional right; (2) what impact the

accommodation of the client's right would have on others, including clients and staff; and

(3) whether there is an absence of a ready alternative to the restriction.  *Beaulieu*, 690

F.3d at 1039.

### 1. Rational Connection Factor

The "connection between a [] regulation and a government interest is inadequate

when 'the logical connection between the regulation and the asserted goal is so remote

as to render the policy arbitrary or irrational.'"  *Herlein v. Higgins*, 172 F.3d 1089, 1091

(8th Cir. 1999) (quoting *Turner*, 482 U.S. at 89–90).[6]  MSOP states that it prohibited

Mason's phone calls and visits with Keinanen because their continued communication

presents security risks and is counter-therapeutic for Mason.

The Defendants do not demonstrate how calls or visits with Keinanen continue to

pose a security threat or interfere with Mason's therapeutic progression.  While actual

proof is not required, a reasonable person must be able to understand the connection.

*Id.*  In *Herlein*, a prison banned possession of music with explicit lyrics because it could

---

[6] *Herlein* addresses the rights of the criminally incarcerated, not the civilly committed. *Herlein*, 172 F.3d at 1090.  The Court looks to *Herlein* for guidance on the application of the *Turner* factors, not to ascertain what rights Mason should be afforded.

arouse behavior among inmates that would create a security risk.  *Id.* at 1090.  The *Herlein* court found that "violent and sexually explicit lyrics" could encourage dangerous behavior in an environment that includes "gangs and sex offenders." *Id.* at 1091.  A similar logical connection is not obvious here where MSOP clients' calls and visits are monitored and Keinanen has not worked at MSOP for over five years.

The Defendants argue that allowing visits and phone calls would subject MSOP to "escape attempts, contraband, and more criminal activity by compromised staff and clients." (Defs.' Mem. Supp. Summ. J. Mot. at 30.)  They supply no support for this assertion.  Mere recitations of abstract security concerns are not a sufficient basis to infer a rational relationship between a regulation and a legitimate interest. *Thomas v. Gunter*, 32 F.3d 1258, 1260 (8th Cir. 1994) (holding that unelaborated assertions between a prison's regulation of First Amendment activity and the prison's interest in security were insufficient to support granting summary judgment).

Moreover, the interactions between Mason and Keinanen in the past were counter-therapeutic primarily due to Keinanen's position as an MSOP staff member.  The circumstances have changed.  Keinanen is no longer an MSOP staff member.  The improper nature of their relationship at its formation and early stages is not necessarily indicative of the nature of their relationship years later.

The record does not establish that there is a rational connection between the MSOP's restriction and its legitimate security and therapeutic interests.  Further factual

development is required to resolve that question.  Therefore, there is a factual dispute
that cannot be resolved at the summary judgment stage.

### 2.     Remaining *Turner* Factors

Having determined that a rational connection is not established on this record, the
Court need not consider the remaining three *Turner* factors.  *Simpson*, 879 F.3d at 279.
However, if the Court were to balance the remaining factors, it would not support
granting summary judgment.

The second *Turner* factor examines whether Mason has an alternative means of
exercising the impinged constitutional right.  *Beaulieu*, 690 F.3d at 1041.  The alternative
means of exercising the First Amendment right "must be viewed sensibly and
expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989).  Moreover, the alternatives
need only be available, not ideal.  *Holloway v. Magness*, 666 F.3d 1076, 1080 (8th Cir.
2012).  Thus, this factor evaluates whether MSOP has supplied an alternative through
which Mason may exercise his First Amendment right of association.

Mason is not permitted to call or receive visits from Keinanen but is permitted to
communicate with her by U.S. Mail.  In *Beaulieu*, the Eighth Circuit found that civilly
committed clients' ability to correspond with their attorneys by **visitation and mail** were
viable alternatives to telephone calls.  *Beaulieu*, 690 F.3d at 1041.[7]  Here the limitation on

---

[7] MSOP also cites to two Eighth Circuit cases where visitation and mail were considered
viable alternatives to phone calls, *Benzel v. Grammar*, 869 F.2d 1105, 1109 (8th Cir. 1989) and
*Holloway*, 666 F.3d at 1080.  The plaintiffs in those cases were prisoners and their constitutional

Mason's communication is more significant; it blocks both calls **and** visitations with Keinanen. Limiting Mason's communications to the written letters may effectively diminish his relationship with Keinanen. However, examined "expansively," allowing Mason to exchange mail with Keinanen may suffice as an alternative to visits and calls. In the end, whether exchanging mail is a sufficient alternative form of association to satisfy the second factor is a question of fact that should be resolved by a jury.

The third *Turner* factor addresses whether and to what degree accommodation of Mason's right would impact the institution, resources, staff, and other MSOP clients. *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003). The essence of the question is one of resource allocation. Where accommodating a plaintiff's right would cause a significant reallocation of financial resources, courts should defer to administrators' judgments regarding regulations. *Id*.

Mason argues that Defendants have made no showing of the burden it incurs by allowing him to call and receive visits from Keinanen. Defendants state that allowing calls and visits between Mason and Keinanen would "impact the balance of institutional resources of MSOP as a whole." (Moser Decl. ¶ 10.) However, MSOP calls are monitored, and the Defendants do not explain why calls between Mason and Keinanen would warrant heightened monitoring. Nor do they present any evidence of the sort of special

---

rights are more restricted than the plaintiff here. However, the limitations placed on the plaintiff here were more restrictive than those placed on the plaintiffs in *Benzel* and *Holloway* as they were not prevented from visits.

procedures MSOP would require to ensure that Mason's visits and calls with Keinanen would not present security or therapeutic risks.  As such, the third factor weighs in Mason's favor.

The final *Turner* factor examines whether there are any simple and cost-effective alternatives to the restrictions placed on a patient by the institution that achieve the institution's goals.  *Beaulieu*, 690 F.3d at 1041.   "The existence of obvious, easy alternatives may be evidence that the regulation is not reasonable[.]" Turner, 482 U.S. at 90.  However, without a rational connection between the regulation and the institutional and therapeutic interests "it is difficult to determine whether any alternative policies or procedures might have accommodated" Mason's First Amendment rights.  *Thomas*, 32 F.3d at 1260.

Taken together, the remaining *Turner* factors are inconclusive as to whether Mason's First Amendment rights have been reasonably accommodated.  On this record, whether MSOP has provided an alternative means for Mason to exercise his First Amendment right to associate with Keinanen is a question of fact..  The record does not demonstrate that MSOP must take on any additional burden to allow Mason to have visits and/or calls with Keinanen.  And finally, the fourth factor is inconclusive because the record does not establish an objectively reasonable connection between MSOP's restrictions and its legitimate interests at this stage.  As such, there are genuine issues of

material fact that remain as to the *Turner* factors. The Court will deny the Defendants'

Motion for Summary Judgment on Mason's First Amendment claim.

### B.    Procedural Due Process Claim

"To set forth a procedural due process violation, a plaintiff, first, must establish

that his protected liberty or property interest is at stake." *Schmidt v. Des Moines Pub.*

*Sch.*, 655 F.3d 811, 817 (8th Cir. 2011) (quotation omitted).  If a plaintiff does have a

protected liberty or property interest, then the Court considers what process is due by

balancing three factors: (1) the specific interest that was affected, (2) the likelihood that

the MSOP procedures would result in an erroneous deprivation of that interest, and (3)

MSOP's interest in providing the process that it did, including the administrative costs and

burdens of providing additional process.  *See Senty-Haugen*, 462 F.3d at 886 (citing

*Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976)).

The exact requirements for the process to constitute sufficient due process are

flexible and specific to each particular situation.  *Id.* at 887–88.  The most important

mechanism for evaluating the process is whether the aggrieved party received notice of

the factual bases for the deprivation of the right and a fair opportunity to rebut the

decision.  *Id.* at 888.

The Court held previously in this case that Mason, despite being a civilly detained

person, has a protected liberty interest at stake: his First Amendment right to associate

with Keinanen, with whom he shares a personal connection.  *Mason v. Johnston*, No. 19-

2597, 2020 WL 5835223, at *4 (D. Minn. Sept. 30, 2020).

In 2017, Mason called Keinanen at several different numbers and the numbers were subsequently blocked by MSOP.  In issuing the blocks, the Court finds, Defendants provided Mason with sufficient notice and opportunity to be heard.  As the numbers were blocked, MSOP provided Mason with a notification which included brief statements of reasoning and indicated the duration of block.  Also, in 2017 Mason's primary therapist spoke to him directly about why he was not permitted to speak with Keinanen.  Most importantly, a BER was issued to Mason for his continued contact with Keinanen and he had an opportunity to express his position at the subsequent BER hearing.  Therefore, the Court finds that MSOP satisfied its due process requirements in blocking Keinanen's numbers in 2017.

While the factual record on the number blocking process in 2019 is somewhat different, it is still sufficient to comport with due process.  Unlike the blocks issued in 2017, the record does not show that Mason was affirmatively notified of the 2019 block.  Nonetheless, within a week of noticing the block, Mason was provided with the reasoning and factual basis for the block.  Moreover, he was provided with an opportunity to rebut the decision to block the number, and after the block was upheld, the opportunity to appeal the decision to uphold the block.  That opportunity to rebut MSOP's decision decreased the likelihood of Mason's constitutional rights being erroneously deprived.  Mason was provided sufficient due process to satisfy the constitutional standard on his Fourteenth Amendment claim.  *See Senty-Haugen*, 462 F.3d at 886.

The Court will grant the Defendants' Motion for Summary Judgment on Mason's procedural due process claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 60] is:

1. **DENIED** as to the First Amendment Claim;

2. **GRANTED** as to the Fourteenth Amendment Due Process Claim.

DATED:  March 16, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court